UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

FREDERICK MILLER,                )
                                 )
        Petitioner,              )
                                 )
v.                               )        No. 1:12-cv-50-HSM-WBC
                                 )
TONY HOWERTON,                   )
                                 )
        Respondent.              )

## MEMORANDUM OPINION

Acting *pro se*, Frederick Miller ("Petitioner"), an inmate confined in the Morgan County Correctional Complex, brings this petition and amended petition for a writ of habeas corpus, 28 U.S.C. § 2254, challenging the legality of his confinement under a 2004 Hamilton County, Tennessee judgment (Docs. 1 and 20). A jury convicted Petitioner of first degree murder, attempted first degree murder, and especially aggravated robbery—offenses for which he is now serving a prison sentence of life and a consecutive sixty years.

Warden Tony Howerton has submitted answers to both petitions, which are supported by copies of the state court record (Docs. 8, 8-1, Notice of Filing of State Court Record, Addenda 1-4, and 21). Petitioner has replied to the Warden's initial answer, and thus the case is ripe for disposition (Docs. 13 and 15 [supplement]).

## I.    PROCEDURAL HISTORY

Petitioner's judgment was affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA") and the Tennessee Supreme Court denied him further direct

appeal. *State v. Miller*, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211 (Tenn. Crim.

App. Sept. 14, 2006), *perm. to app. denied*, (Tenn. 2007). Petitioner applied for state

post-conviction relief, but the trial court declined relief as did both of the state appellate

courts. *Miller v. State*, No. E2009-00232-CCA-R3-PC, 2011 Tenn. Crim. App. LEXIS

445 (May 20, 2011), *perm. to app. denied*, No. E2009-00232-SC-R11-PC, 2011 Tenn.

LEXIS 932 (Tenn. Sept. 21, 2011). There followed this timely habeas corpus

application.

## II.  BACKGROUND

The factual recitation is taken from the TCCA's opinion on direct review.

> On September 27, 1995, the victims, Thomas "Butch" Cripps and Christopher Galloway, were working at the Kwik-E Liquor Store on Rossville Boulevard in Chattanooga. The victim Cripps provided the following account of what transpired on this evening:
>
>> At about ten minutes till eleven, this young black male came in, walked around the building. I asked if I could help him, he said he was looking, walked back to the cooler at the rear of the store, walked around, looked around, looking more at the cabinets and counter and purchased a small miniature or one-ounce bottle of Canadian Mist, and then walked out and walked back to the right of the store. And that's when I told Chris you know, 'That was just a little strange.'
>>
>> And about a minute and a half, two minutes later, another black male come [sic] in with a gun in his hand and a ski mask on and put his gun to the back of Chris's head, told-took him to the end of the counter-excuse me, took him to the end of the counter, made me walk backwards to him, brought us back up to the cash register, turned us both facing away from him, keeping his gun on us, took my gun from

2

my waistband, demanded money. I gave him the money bag we kept under the register.

He then walked us back to the end of the counter and around and told us both to lay down on the floor face down, which we did. He asked where the camera was, or where the recorder was. I told him it was in another room, and at which time he backed up and shot Chris in the back of the head. And I jumped up, and trying to defend myself, and he shot me twice while we fought out the front door, and then he ran off and I came back inside and called the police.

Meanwhile, Officers Scott Taylor and Joseph Brooks of the Chattanooga Police Department were on patrol on Rossville Boulevard in the area of Kwik-E Liquor Store. They observed a black male in the alley between "Walter A. Woods and the liquor store." Officer Taylor was suspicious because all businesses in the area were closed except the liquor store. The officers turned in between "Walter A. Woods and the little barber shop building." As they did so, "there was another car that came out of the bushes with its headlights on as soon as we turned in." The Officers activated their blue lights, and the vehicle, which was driven by Kevin Hinton, stopped. Hinton told the officers he was having problems with his lights.

While the officers were questioning Hinton, shots "rang out" from the liquor store. At this time, Officer Brooks placed Hinton in the back of the patrol car. After surveying the area and following the arrival of "backup[,]" Officer Taylor went inside the liquor store and discovered that the perpetrator had already fled the scene.

The victim Calloway died as a result of his wounds. The victim Cripps was hospitalized for three days, and it took him several months to recover from his injuries.

Following interviews with the police, Hinton implicated the Defendant in the crimes. On February 12, 2003, a Hamilton County grand jury returned a six-count indictment against the Defendant, charging him with first degree premeditated murder, first degree felony murder, attempted first degree murder, aggravated assault, and two counts of especially aggravated robbery.

3

Pursuant to an agreement with the State, Hinton testified against the Defendant at trial and provided the following version of events. Hinton testified that "a few weeks before" September 27th, he was staying with Mr. Gary Fitch and Ms. Yarshaunajania Threatt at a residence on Taylor Street. Hinton introduced the Defendant, as Darius Jones, to Mr. Fitch and Ms. Threatt. According to Hinton, on September 27th, he, Mr. Fitch, and the Defendant were in the front yard of the residence on Taylor Street. The men discussed that they "need to go get some cheese," meaning they needed money and were going to rob someone. Mr. Fitch chose not join Hinton and the Defendant. Hinton testified that he and the Defendant left the residence in Hinton's white Bonneville, looking for a place to rob. The Defendant decided on the Kwik-E Liquor Store. Hinton went into the liquor store first to see how many individuals were inside the store and, while inside, he purchased a bottle of Canadian Mist. He then returned to the vehicle and reported to the Defendant. The Defendant, who was armed and wearing a ski-mask and a "blue-and-black or a blue-and-purple coat[,]" got out of the car and went inside the liquor store.

Hinton testified that the Defendant phoned him "two or three hours later" and told him "to stay right there, he would be over there in a minute." Upon his arrival, the Defendant asked "what happened ... do they know who did it, and [Hinton] told him no." The Defendant told Hinton not to worry because there was only "circumstantial evidence." Hinton stated that the Defendant then went out of town for about three weeks.

The State called several witnesses to corroborate Hinton's testimony. The victim Cripps identified Hinton as the first man to enter the liquor store who purchased the bottle of Canadian Mist. He was unable to identify the shooter; however, he described the assailant as "approximately five-foot-ten, five-eleven, roughly 135, 145 pounds, had on a blue ski mask, more turquoise blue, dark pants and a shirt.... African American." Officer Taylor testified regarding his detention of Hinton in the nearby parking lot and his observations upon entering the liquor store following the robbery and murder.

Ms. Threatt testified that Hinton began staying at her house in the summer of 1995 and, at some point, the Defendant began staying there too. On the day of the robbery and murder, Ms. Threatt overheard Hinton and the Defendant

4

talking about "they need some money." According to Ms. Threatt, the Defendant and Hinton left the residence in Hinton's car. She stated that after that evening, she did not see the Defendant again for "a couple of weeks or a month later." In the presence of the jury, Ms. Threatt viewed the video surveillance tape that had recorded the robbery and murder. She testified that she recognized the Defendant's voice from the videotape. Ms. Threatt could not identify the jacket worn by the assailant on the videotape, but she opined that the jacket "looked like the jacket [the Defendant] had."

Mr. Fitch testified that he lived with Ms. Threatt on Taylor Street in 1995. According to Mr. Fitch, the Defendant and Hinton "would come around every other day, every couple of days.... They both would stay off and on a couple nights a week maybe." He also recounted the conversation between him, the Defendant, and Hinton about going to "get some cheese." Mr. Fitch stated that following the evening in question, the Defendant "stopped coming by" for "a couple of weeks [.]" When the Defendant returned, he said "he'd been out of town with his family." The Defendant also told Mr. Fitch that "[w]henever Kevin was drinking, he would talk too much." In December of 1995, Mr. Fitch overhead the Defendant state that he was going to kill Hinton. Mr. Fitch also overheard a conversation between the Defendant and Hinton about burning a jacket.

Officer Charles Russell of the Chattanooga Police Department testified concerning several statements made by the Defendant, who was transferred in January of 1996 from the Hamilton County Jail to the Police Services Center and asked to give a statement. The Defendant declined to give a statement, but several statements made by him during the initial phase of the interview were admitted into evidence. On cross-examination, Officer Russell testified that during the search for the perpetrator immediately following the robbery and murder, officers apprehended a man named "James Burkes" in a nearby area of town, and he was initially a suspect in these crimes. According to Officer Russell, James had on dark pants and brown boots, which matched the description given by Officer Taylor of the individual he observed in the alleyway by Kwik-E Liquor Store prior to the robbery and murder.

The Defendant did not testify on his own behalf. He did offer an expert witness who testified to the poor quality of the

5

surveillance videotape. The Defendant also called Officer Brooks. Officer Brooks testified that after taking Hinton to the Police Services Center for questioning following the robbery and murder, Hinton asked "if James was here also[.]"

*State v. Miller*, 2006 WL 2633211, at *1-4. On these facts, Petitioner was convicted of first degree murder, attempted first degree murder, and especially aggravated robbery.

## III. STANDARD OF REVIEW

Under the review standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), codified in 28 U.S.C. §§ 2241, *et seq.*, a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

6

This is a high standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). Further, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV.    DISCUSSION

The § 2254 petition asserts four grounds for relief.  Three of those grounds involve ineffective assistance of counsel and one alleges prosecutorial misconduct based on an alleged *Brady* violation.  The amended § 2254 petition contains additional grounds of ineffective assistance of counsel.  The Warden argues, in his answer, that Petitioner is not entitled to relief with regard to the claims in the petition because the state court rejected those claims on the merits and because the deferential standards of review set forth in 28 U.S.C. § 2254 counsel against such relief. With respect to the claims presented in the amended petition, the Warden suggests that all three claims are procedurally barred from habeas corpus review and that two are not cognizable federal claims in the first place.

Petitioner takes a contrary position, maintaining, in his reply to the Warden's answer to the first petition, that deference is unwarranted because the state court decisions fail one or more of the tests in § 2254(d).  Petitioner also finds fault with the composition of the answer, suggesting that the Warden quoted extensively from the state court decisions, but failed to follow those quotations with a complete and proper factual and legal analysis of his claims.

7

The Court agrees with respondent Warden concerning the suitability of habeas corpus relief and, for the reasons which follow, will **DENY t**he petition and **DISMISS** this case. Petitioner's claim of prosecutorial misconduct will be discussed first and the remaining grounds of ineffective assistance will be addressed in the order in which they were presented.

### A.     Prosecutorial Misconduct (Pet. at 16, Ground 3)

Petitioner maintains that fingerprints were taken and a gunshot residue test performed on an alternate suspect, one James Burks, who Petitioner asserts was seen running away from the crime scene and who was apprehended wearing clothes similar to those described by an officer at the crime scene who had observed the fleeing suspect.  However, the results of those tests were never disclosed to the defense. Furthermore, Petitioner's fingerprints and other fingerprints were taken one week before trial, but the results of these tests were not handed over to the defense either. Petitioner suggests that the reason the report showing the analysis of his fingerprints was not revealed to him was because the report would have shown that his prints did not match prints which had been tied to the crime. The failure to disclose these materials, so Petitioner maintains, rendered his trial unfair and violated the *Brady* rule.

The TCCA began its discussion of petitioner's claim by citing to *Brady v. Maryland*, 383 U.S. 83 (1963), for its holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Miller*, 2011 Tenn. Crim. App. LEXIS 445, at *24 (quoting *Brady*, 383 U.S. at 87).  The TCCA noted that there was nothing to demonstrate that the

defense requested the results of the fingerprint analysis or the gunshot residue tests or that the prosecution suppressed those results. It also pointed out that the results were not contained in the record and found that Petitioner had not shown that the undisclosed results were either favorable or material. The state appellate court further found "unavailing" petitioner's allegation that, by failing to follow-up on the test results after the trial, the prosecutor had committed misconduct. The TCCA did not give Petitioner relief on this claim.

As the TCCA recognized, *Brady* provides the governing legal rule for claims that the prosecutor failed to disclose favorable evidence. *See Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014) (identifying *Brady* as clearly established law"); *Johnson v. Bell*, 525 F.3d 466, 474 (6th Cir. 2008) (noting that the TCCA "identified *Brady* as the controlling authority" and that "the deferential AEDPA standard applies"). There are three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching;(2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-83 (1999). Prejudice exists if there is a reasonable probability that disclosure of the evidence would have led to a different result, so as to undermine confidence in the outcome. *Johnson*, 524 F.3d at 475 (quoting *United States v. Bagley*, 473 U.S. 667, 678, 682 (1985), and *Strickler*, 527 U.S. at 289-90).

The TCCA determined that nothing in the record showed that the prosecutor suppressed the test results or that this evidence was favorable or material. A state court's finding that no evidence has been presented to support a claim is a factual

finding not to be disturbed unless it is an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *Bugh v. Mitchell*, 329 F.3d 496, 500-501 (6th Cir. 2003) ("This presumption of correctness also applies to the factual findings of a state appellate court based on the state trial record.") (citations omitted); *Hardaway v. Withrow,* 305 F.3d 558, 563 (6th Cir. 2002) (same)*, Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000) (a state court's determination that a petitioner had offered no credible evidence to support a claim that a key witness lied is a factual finding), or unless a petitioner provides clear and convincing proof to refute it. *See* 28 U.S.C. §§ 2254(d)(2) and (e)(1). Petitioner has not shown that these state court findings concerning the lack of evidence to support his *Brady* claim are unreasonable nor has he offered any contravening proof.

Deferring to the factual finding that there was nothing to satisfy any of the elements of a *Brady* claim necessarily results in the conclusion that the resolution of this claim by the state court was not contrary to or an unreasonable application of the principles of *Brady*. No relief is warranted with respect to this claim.

**B.     Ineffective Assistance of Counsel (Pet. at 14-16, Grounds 1, 2 and 4; Amd. Pet. at 2-18)**

Petitioner asserts that he received ineffective assistance from his attorney at trial and on appeal. Among trial counsels' cited shortcomings were their failures: (1) to challenge the admission of a voice identification and to present the issue on appeal; (2) to move for a fast and speedy trial and to raise the issue on appeal; and (3) to cross-examine properly and to impeach two prosecution witnesses and to press this claim on appeal.

### 1. The Law

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. IV. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that renders the result unreliable.

*Id.*

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). There is a strong presumption that counsel's

conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

Second, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner must demonstrate that, due to counsel's deficient performance, he was "deprived of a fair trial, a trial whose result is reliable." *Id.* at 687. Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992).

While both prongs must be established in order to meet a petitioner's burden, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S.at 697. A petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a *Strickland* claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### 2.  Analysis

When these claims of ineffective assistance were carried to the TCCA, the state appellate court cited to *Strickland* and employed its two-pronged test in reviewing Petitioner's claims. Thus, its conclusion relative to those claims is not contrary to the well-established legal rule in Supreme Court cases governing the claims. The question

Case 1:12-cv-00050-HSM-WBC   Document 35   Filed 02/25/15   Page 12 of 30   PageID #: 239

then becomes whether the state court's application of *Strickland* to the facts of Petitioner's case was unreasonable.

Each of counsel's alleged failings will be addressed individually.

### a. Failure to attack a voice identification

As his first example of ineffective assistance, Petitioner points to counsel's failure to object to a voice identification, which he views as unduly suggestive and as having been made without the presence of counsel at a critical stage of the criminal proceedings. Petitioner asserts that, in 2004, a witness was shown a video tape of the crime and immediately identified Petitioner's voice, though he had not seen or spoken to the witness since 1995. (The crimes occurred on September 27, 1995.) Also the witness had not been shown the tape in 1995-1996, when she was interviewed numerous times by the police. Petitioner finds it troubling that the witness was shown only one tape and knew that she was expected to identify him on that tape. He thus asks rhetorically how, under these circumstances, the identification could not have been unduly suggestive.

When this claim was presented in the post-conviction appeal, the TCCA found that the record did not support the ineffective assistance claim since the record contained trial counsel's motion to suppress, challenging the admissibility of the voice identification. Even so, the TCCA addressed whether the identification was properly admitted. The state court held that the voice identification in Petitioner's case was not synonymous with a show up or a line up and that the law governing those types of identifications did not apply to the voice identification made in Petitioner's case. For example, the videotape which the witness against Petitioner viewed and heard was an

actual recording of the crime. Moreover, the witness testified that she knew Petitioner and that she was familiar with his voice. The state court then cited to state evidentiary law which requires only that a witness think—she need not be certain—that she can identify the voice before she gives her opinion as to the identity of the speaker.

The TCCA went on to conclude that suppression of the voice identification was not called for under state evidentiary law,[1] given the circumstances in Petitioner's case, and that neither trial nor appellate counsel had rendered ineffective assistance in this instance. As this Court reads the state court decision, the TCCA's finding that counsel filed a motion to suppress the voice identification is tantamount to a finding of no deficient performance and its further finding that suppression was unwarranted equates to a finding of no prejudice.

In Petitioner's response to the answer, he admits that counsel filed a motion to suppress, though he faults counsel for failing to support the motion with sufficient argument. The best argument for suppression, so Petitioner posits, would have been that the voice identification testimony falls within the scope of *Neil v. Biggers*, 409 U.S. 188 (1972). According to *Biggers*, an identification of a defendant which is impermissibly suggestive, and which presents an unacceptable risk of irreparable misidentification, violates due process. *Biggers* articulated certain factors to be applied to determine whether an impermissibly suggestive identification is nonetheless reliable.

---

[1] Whether the TCCA correctly applied state evidentiary rules to find that the voice identification testimony was properly introduced is not a constitutional matter and does not concern this Court. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

First of all, Petitioner "does not have a constitutional right to have his counsel press nonfrivolous points if counsel decides as a matter of professional judgment not to press those points." *Coleman v. Mitchell*, 244 F.3d 533, 541 (6th Cir. 2001) (citing *Jones v. Barnes*, 463 U.S. 745, 750–51 (1983)). Second, Petitioner presented these allegations to the TCCA (Addendum 4, Doc. 1, Amended post-conviction appellate brief at 21-22). The TCCA held against him in this regard, and he has not cited to a Supreme Court decision, and this Court is not aware of one, dealing with materially indistinguishable facts, to support his position that the due process analysis in *Biggers* applies to voice identifications.

Though the Court is aware that lower federal courts have extended the *Bigger* analysis to voice identifications, *see United States v. Recendiz*, 557 F.3d 511, 528 (7th Cir. 2009) ("A witness's voice identification is subject to the same due process analysis as other forms of identification."); *but see Wright v. Marshall*, 656 F.3d 102, 111 (1st Cir. 2011) (noting that concerns about identification evidence "are lessened substantially . . . when the identification is based on a witness's pre-existing relationship with a defendant") (citation omitted; *United States v. Panico*, 435 F.3d 47, 49 (1st Cir. 2006) ("Lay witness identification, based on the witness' prior familiarity with a voice, is a commonplace way in which voices are identified"), the Court likewise recognizes that the source for determining whether a state court's decision passes § 2254(d)'s tests is limited to the holdings of the Supreme Court. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

Petitioner also faults the TCCA for not citing to case law or authority to undergird its conclusion that the voice identification introduced against him was different from a

15

"show up" or a "line up" identification (Doc. 13 at 3). Petitioner's critique of the state court's opinion has no legal foundation. The Supreme Court has stated that the drafting of state court opinions is not a suitable subject for habeas corpus review. *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011) ("Opinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court."). It has also stated that, even in the absence of a citation to a well-established principle in a Supreme Court case, a state court decision is still entitled to deferential review under § 2254(d). *See Early v. Packer*, 537 U.S. 3, 8 (2002).

As it is, the state court evaluated counsel's alleged shortcoming under state evidentiary law, found that the identification testimony was properly admitted, rejected Petitioner's due process arguments, and concluded that Petitioner's trial and appellate attorneys had not given him ineffective assistance in this regard.

Because Petitioner has not pointed to a Supreme Court case which shows that the state court unreasonably applied *Strickland* in finding that he did not receive ineffective assistance from his attorneys, the state court decision must remain undisturbed. No writ will issue with respect to this claim.

### b. Failure to file a speedy trial motion

Petitioner alleges that he was tried in May of 2004, nine years after the crime occurred, and that during that interim, the case against him was dismissed twice. Petitioner charges counsel with failing to move for dismissal despite the clear indication that his client's right to a speedy trial had been violated. Trial counsel knew that Petitioner had filed a *pro se* speedy trial motion, yet counsel failed to adopt the motion and appellate counsel did not preserve the claim on direct appeal.

16

When counsel's alleged error with respect to the speedy trial issue was reviewed by the TCCA, it first noted that the Sixth Amendment guarantees the right to a speedy trial and that four factors are to be applied to determine whether that right has been violated. They include: "the length of the delay, the reasons for the delay, the defendant's assertion of the right, and the prejudice suffered by the defendant from the delay." *Miller*, 2011 Tenn. Crim. App. LEXIS 445, at * 22.

Prejudice was the only factor pled by Petitioner, who claimed that the passage of time had dimmed the memory of an alibi witness. *Id.* The TCCA pointed out that the post-conviction court had credited counsel's testimony at the evidentiary hearing that Petitioner had provided him no information relative to an alibi and, thereafter, had found that Petitioner had failed to prove prejudice. The TCCA agreed with the lower court's findings and it too concluded that Petitioner was not entitled to relief.

The appropriate analysis for determining whether a defendant's right to a speedy trial has been denied is enunciated in *Barker v. Wingo*, 407 U.S. 514 (1972), *see Brown v. Bobby*, 656 F.3d 325, 330 (6th Cir. 2011); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005), which requires application of the same four-factor balancing test to which the TCCA referred.[2] Because the state court relied on the teachings of *Barker* as supplying the governing legal principle to a speedy-trial claim, its decision is not contrary to the well-established federal law in a Supreme Court case.

---

[2] The TCCA did not directly cite *Barker*, but cited instead to *State v. Utley*, 956 S.W.3d 489, 492 (Tenn. 1997), a Tennessee Supreme Court case, which relied on *Barker* and employed its four-factor test to determine whether a defendant's speedy trial right had been violated. As the *Utley* court noted, Tennessee courts adopted the *Barker* test in *State v. Bishop*, 493 S.W.2d 81, 83–85 (Tenn. 1973), some twenty-three years earlier.

*Barker* instructs that the four factors are related and must be considered together, along with other relevant circumstances, which means that "courts must still engage in a difficult and sensitive balancing process." *Barker*, 407 U.S. at 533.

The timeline as established by the post-conviction court contained three relevant dates. The presentment charging Petitioner was issued February 12, 2003, Petitioner's' *pro se* speedy trial motion was filed on March 25, 2003; and his trial commenced on May 24, 2004. Petitioner's argument concerning the length of the delay rests primarily upon the time that passed between date of the crime and date the trial began, which he calculates to be nine years.[3] But *Barker* instructs that the benchmark for determining the length of the delay is the time between the date of the indictment or the arrest, whichever is earlier, and the trial. The time that passed between the date of Petitioner's presentment and the trial was some 15 months. A delay of one year generally is presumed sufficiently prejudicial to invoke a weighing of the remaining *Barke*r factors. *United States v. Williams*, 231 F.App'x. 457, 462, 2007 WL 2302360, at *4 (6th Cir. Aug. 10, 2010) (citing *United States v. Watford*, 468 F.3d 891, 901 (2006)).

The factor involving the reason for the fifteen-month delay cannot be assigned any weight at all because the Court has found nothing in the record to explain it and the TCCA made no findings with respect to that factor. The Petitioner did assert his right to a speedy trial in his *pro se* motion filed on the month following his arrest for the crime, and this factor weighs in his favor.

---

[3] The TCCA rejected the timeline petitioner advocated because he failed to support it by citing to the record, in violation of state procedural rules. *Miller*, 2011 Tenn. Crim. App. LEXIS 445, at *21.

However, the prejudice factor falls solidly on the respondent's side. Petitioner's claim of prejudice was grounded upon his allegation that the memory of an alibi witness had diminished as a result of the delay. However, as the TCCA observed, counsel testified that Petitioner did not provide any alibi witnesses (testimony which the post-conviction court accredited). The TCCA also noted that Petitioner did not call the alibi witness during the post-conviction hearing to testify as to the effect, if any, of the delay. Further, the TCCA found it significant that, though Petitioner complained that he was subjected to pretrial incarceration, he acknowledged that he was confined on other charges during that time.

Under 28 U.S.C. § 2254(d), '[w]hen assessing whether a state court's application of federal law is unreasonable, the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (citation and internal quotation marks omitted). The speedy-trial right "is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied." *Barker*, 407 U.S. at 521. Also "[a] balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." *Id.* at 530.

In recognition of the "leeway [state] courts have in reaching outcomes in case-by-case determinations," when applying general legal rules, *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), such as *Barker*'s speedy-trial analysis, this Court finds that the TCCA's rejection of Petitioner's ineffective assistance claim based on counsel's alleged

*Barker*-related misstep, was neither an unreasonable application of *Strickland* (or *Barker*) nor based on an unreasonable determination of the facts presented to the state courts. No writ will issue.

### c. Failure to cross-examine state's witnesses properly

Testifying for the prosecution were Jarshaunajania Threatt and Gary Fitch. Petitioner maintains that trial counsel gave him ineffective assistance by failing to cross-examine these two witnesses properly and to impeach their testimony.

The alleged error in cross-examining Ms. Threatt involved a statement she gave on January 15, 1996, reporting that she had seen Petitioner and that he had scared her. It would have been impossible for her to have seen Petitioner on that date, so he asserts, because he had been arrested six days before and was incarcerated. Furthermore, Petitioner contends that Ms. Threatt admitted twenty-eight times from the witness stand that she could not recall what had happened during the period of time when the crime occurred because she had smoked crack and marijuana daily. Petitioner argues that counsel should have destroyed her credibility by questioning her about her January statement and that counsel should also have moved to strike her testimony and remove her from the witness list.

Mr. Finch, so Petitioner indicates, also gave a statement to police that, on the night of the crime, Petitioner's co-defendant left the house alone, whereas in his earlier statements, Mr. Finch said that he, Petitioner, and the co-defendant had planned a robbery and that Petitioner and the co-defendant then left together. Petitioner maintains that counsel should have asked Mr. Finch whether the State had offered him anything in

exchange for his testimony and that counsel should have asked the same question of Ms. Threatt.

Petitioner's trial counsel testified during the post-conviction hearing and was asked about Ms. Threatt's statement. Counsel reread the document and explained, first, that he did not think she was saying that she saw Petitioner at a store on a day when he was supposedly incarcerated and, second, that counsel did not cross-examine her about a possible falsehood because he did not want to reveal to the jury that his client was incarcerated on that date. Counsel characterized the latter decision as tactical and pointed out that he had challenged Ms. Threatt's credibility in other ways, such as questioning her about inconsistencies in her testimony. Counsel believed that he had seriously undermined the witness's credibility because, at the conclusion of her testimony, she had said, "I just don't know."

Trial counsel related that he had objected to Mr. Finch's testimony as hearsay, but that the objection had not been sustained. Likewise, Petitioner's appellate counsel also testified during the hearing, stating that he had included in Petitioner's appeal only those issues which had been preserved for further review.

When these alleged attorney errors were presented during Petitioner's post-conviction appeal, the TCCA pointed to trial counsel's testimony in which he had opined that Petitioner had misconstrued Ms. Threatt's statement and that she was not saying that she saw Petitioner on January 15, 1996. Not only did counsel interpret Ms. Threatt's statement differently from Petitioner, but counsel also testified that he had made a tactical decision not to disclose to the jury that Petitioner was incarcerated on that date. The TCCA also reiterated counsel's testimony that he had examined the

21

witnesses about discrepancies between their versions of events and that he felt that he had destroyed Ms. Threatt's credibility when she responded, "I just don't know." The TCCA then found that Petitioner had adduced no proof at the post-conviction hearing as to any alleged deals these witnesses had with the prosecution before going on to determine that Petitioner's complaint regarding undisclosed deals was speculative at best.

The TCCA set forth the deferential standards *Strickland* imposes on a reviewing court, observing specifically that counsel's conduct is not to be measured with "20-20 hindsight" and that strategic decisions are not subject to second-guessing unless they are based on inadequate preparation. The TCCA also characterized as strategic appellate counsel's decision to offer on appeal only claims which had been preserved during earlier proceedings—a decision with which the state appellate court agreed, given the slim likelihood of success on an issue which has not been preserved.

Finding trial counsel's decisions concerning how best to cross-examine the witnesses to be tactical and appellate counsel's decision to raise only issues preserved on appeal likewise tactical, the TCCA determined that Petitioner had failed to show ineffective assistance and denied relief.

Cross-examination is the "principal means by which the believability of a witness and the truth of [her] testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Though a failure properly to cross-examine a witness could form the basis for a finding of ineffective assistance, *Jackson v. Houk*, 687 F.3d 723, 742-43 (6th Cir. 2012), typically, a decision as to "whether to engage in cross-examination, and if so to what

extent and in what manner, [is] . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987).

Based on Ms. Threatt's concession at the completion of her cross-examination that she "just didn't know," counsel had reason to conclude that he had undermined her testimony sufficiently, that he had convinced the jury that she could not be believed, and that he should not inquire into her January statement, which he did not deem to be damaging to Petitioner and which could have resulted in the detrimental disclosure that his client was incarcerated at that time. Furthermore, as the TCCA indicated, raising issues on appeal that were not first offered at trial rarely is a successful venture.

According to the Supreme Court, strategic decisions are especially onerous for a Petitioner to attack. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."). At any rate, given the presumption that counsel's challenged conduct must be considered sound trial strategy, as well as the difficulty encountered by a petitioner in challenging counsel's tactical decisions, the Court finds the state court could reasonably have found trial counsel's cross-examination of these two witnesses and appellate counsel's decision to omit these claims on appeal to have fallen "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Hanna v. Ishee*, 694 F.3d 596, 612 (6th Cir. 2012) ("The burden rests on the [petitioner] to overcome the presumption that the challenged conduct might be considered sound trial strategy.") (citing *Strickland*, 466 U.S. at 689). Petitioner has not borne his burden.

But even if counsels gave a subpar performance in this regard, Petitioner has not shown he sustained prejudice thereby. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001); *see Harrington v. Richter*, 131 S.Ct. at 770, 792 (2011) ("The likelihood of a different result must be substantial, not just conceivable."). Absent a showing of prejudice, which Petitioner has not made here, the TCCA's rejection of the claimed attorney errors as a violation of his right to receive reasonably effective assistance of counsel was not an unreasonable application of *Strickland.* Petitioner is not entitled to relief with respect to this claim either.

### d. Failure to obtain test results (Doc. 20-1, Amd. Pet. at 2-4)

This claim and the following claims, which were presented in the amended petition, are brought in reliance on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). Respondent asserts that all these claims have been procedurally defaulted and that all but two of them are also time-barred by the AEDPA's one-year statute of limitation in 28 U.S.C. § 2244(d)(1). To place these claims in context, a little legal background will be helpful.

A petitioner commits a procedural default by failing to raise a federal claim first in a state court, which bars habeas corpus relief unless that petitioner can show cause to excuse his default and prejudice as a result of the alleged constitutional violation. *See Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991). *Martinez* articulated a limited equitable exception to the procedural default rules by holding that, where state law requires ineffective-assistance claims to be raised during initial collateral review, post-

conviction counsel's ineffective assistance excuses a procedural default of a substantial claim that a trial attorney rendered ineffective assistance. *Martinez*, 132 S. Ct. at 1320. *Trevino* extended that holding to convictions where state law "as matter of its structure, design and operation [] does not offer . . . a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. Under *Trevino*, *Martinez* applies to Tennessee convictions. *Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014).

In this claim, Petitioner first alleges that post-conviction counsel gave him ineffective assistance by failing to produce at the post-conviction hearing the results of his and another suspect's fingerprint tests and gunshot residue tests performed on the other suspect. Petitioner fails to state a cognizable habeas corpus claim. There is no constitutional right to an attorney in state post-conviction proceedings, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), and hence, no constitutional right to the effective assistance of post-conviction counsel. *See Evitts v. Lucey*, 469 U.S. 387, 397 n.7 (1985) ("Of course, the right to effective assistance of counsel is dependent on the right to counsel itself.") (citation omitted).

Next, Petitioner asserts, not as a freestanding constitutional claim, but as a claim of cause, that post-conviction counsel failed to present allegations that trial counsel did not obtain the results of a gunshot residue test performed on another suspect and of fingerprint tests performed on Petitioner and compare them with results of fingerprints taken from the passenger side of the vehicle used in the crime. Had this been done, so Petitioner posits, there is a "possibility" that the outcome of the trial or the post-conviction hearing would have been different (Doc. 20-1, Amd. Pet. at 3).

25

Post-conviction counsel raised the issue of the missing fingerprint and gun residue test results as a *Brady* claim, *supra*, Section 4A, and the TCCA found no proof in the record that the test results were either material or favorable to Petitioner and no reason to grant post-conviction relief. *Miller*, 2011 Tenn. Crim. App. LEXIS 445, at *25. Since Petitioner's *Brady* did not have merit, counsel did not render a prejudicial performance in failing to raise it. Absent a showing of a deficient performance on the part of counsel in failing to secure those results and ensuing prejudice, Petitioner has no *substantial* claim of ineffective assistance of trial counsel. *Martinez* does not save this claim from a finding of procedural default.

Petitioner suggests, almost as an afterthought, that counsel's statement that Petitioner said he did not want a continuance to allow time for the defense to obtain the test results was a fabrication. First of all, Petitioner has not tied this passing suggestion to the rule announced in *Martinez*. Secondly, the TCCA resolved the *Brady* claim against Petitioner, but made no specific finding with respect to the differing accounts of counsel and Petitioner as to whether Petitioner desired a continuance (Addendum 3, vol. 2, Post-Conviction Hr'g T. at 46-47 and 62-64). Even if, in adjudicating the *Brady* claim, the TCCA implicitly determined which of the two competing versions concerning a continuance was more credible, Petitioner has not offered any clear and convincing evidence to controvert such a determination. Thus, any such a determination would be presumed correct. *See* 28 U.S.C. § 2254(e)(1).

### e. Failure to attack an evidentiary ruling (Doc. 20-1, Amd. Pet. at 4-6)

Petitioner charges that his appellate counsel gave him ineffective assistance by failing to challenge, on the ground of a lack of authentication, the admission of testimony involving the voice identification. Post-conviction counsel likewise failed to present this as a claim for relief and thereby gave Petitioner ineffective assistance.

The exception in *Martinez* is narrow: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for *claims of ineffective assistance of counsel at trial.*" *Martinez*, 132 S.Ct. at 1319 (emphasis added). By its own terms, *Martinez* does not supply cause for the procedural default of claims of ineffective assistance of appellate counsel. *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

Accordingly, this claim is procedurally defaulted but also is untimely under the statute of limitation contained in § 2254(d)(1).

### f. Failure to move to strike voice identification testimony, to impeach state witness Fitch (Doc. 20-1, Amd. Pet. at 7-11)

These claims are essentially a repackaging of Petitioner's previous claims involving counsel's failure to challenge on cross-examination Ms. Threatt's voice identification testimony and Mr. Fitch's testimony. These claims were addressed and were rejected earlier in this opinion. If any new theories or factual allegations have been offered in the amended petition which were not included in the initial petition and if these new theories or allegations were raised and rejected by the state court, they are time-barred. In addition, if the theories or factual allegations were not offered first to the state courts, then they have been procedurally defaulted. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir.1998).

### g. Trial counsel committed perjury (Doc. 20-1, Amd. Pet. at 11-14)

Petitioner asserts that trial counsel, while testifying at the post-conviction hearing, committed perjury when questioned about mounting an alibi defense on Petitioner's behalf. Petitioner does not tie the alleged perjury of trial counsel to any omission on the part of post-conviction counsel or make any arguments as to why *Martinez* applies to rescue this claim from a finding of procedural default or of a time-bar. Indeed, the alleged perjury occurred during collateral proceedings, but the Sixth Circuit has recognized that there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions and has held that alleged infirmities in state post-conviction proceedings are not cognizable on federal habeas review. *See Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002); *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986) ("Claims attacking a state court's application of post-conviction procedures do not state a basis for a federal claim under 28 U.S.C.§ 2254.").

### h. Post-conviction counsel gave ineffective assistance (Doc. 20-1, Amd. Pet. at 11-18)

Petitioner asserts in his last claim that his post-conviction counsel presented only two of eighteen claims Petitioner included in his *pro se* post-conviction petition, despite the trial court's finding that all eighteen claims were colorable constitutional claims. Had post-conviction counsel properly prepared and presented Petitioner's substantial claims to the trial court, Petitioner maintains that there is a reasonable probability that he would have obtained post-conviction relief.

As stated earlier, Petitioner has no constitutional entitlement to an attorney during post-conviction proceedings, *Finley*, 481 U.S. at 555, and he, therefore, has no right to effective assistance from his post-conviction attorney. *Evitts*, 469 U.S. at 397 n.7. Petitioner fails to state a cognizable federal claim in this regard. *See* 28 U.S.C. § 2254(i) (finding that the ineffectiveness of post-conviction counsel "shall not be a ground for relief" in a § 2254 petition).

## V. CONCLUSION

Based on the above legal principles and reasoning, the Court finds that none of Petitioner's claims warrant issuance of the writ and, therefore, by separate order, the Court will **DENY** this § 2254 application and will **DISMISS** this petition.

## VI. CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA) should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(c)(1), a petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2). A petitioner whose claims have been rejected on a procedural basis must that demonstrate reasonable jurists would debate the correctness of the Court's procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001). Where claims have been dismissed on their merits, a petitioner must show reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *See Slack*, 529 U.S. at 484.

After having reviewed each claim individually and in view of the firm procedural basis upon which is based the dismissal of certain claims and the law upon which is based the dismissal on the merits of the rest of the claims, reasonable jurors would neither debate the correctness of the Court's procedural rulings or its assessment of the claims. *Id.* Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.

**A separate judgment will enter**.

**ENTER:**

_____*/s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE